IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL; ALLIANCE FOR THE WILD ROCKIES, | CV 14–229–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, FAYE KRUEGER, in her official capacity, | |
| Defendants. | |

Before the Court are the parties' cross motions for summary judgment. For the reasons explained, the Court grants Defendants' motion for summary judgment.

**Background**

Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies challenge the United States Forest Service's decision to authorize the Environmental Assessment (EA), Decision Notice, and Finding of No Significant Impact (FONSI) for the South Bridger Interface Project (the Project).

The Project involves approximately 250 acres of commercial thinning in

insect-infested forest located approximately 15 miles northeast of Bozeman, Montana in the Gallatin National Forest. The Project Area is within and immediately south of Bridger Bowl Ski Area and within the wildland urban interface. Forest vegetation in the area consists of primarily mature and over-mature densely stocked stands of Douglas-fir and lodgepole pine that have recently experienced epidemic levels of mortality due to western spruce bud-worm and mountain pine beetle infestation. Forest Service scientists have concluded that silvicultural treatments that reduce stocking density are "the only long-term solution to budworm management." FS 5513. The purpose of the thinning Project is to reduce tree mortality from ongoing insect infestations and improve forest health, productivity, and resiliency. The Forest Supervisor approved the Project on August 8, 2014, following the issuance of a Final Environmental Assessment and a pre-decisional objection process.

Plaintiffs' claims arise under the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Administrative Procedures Act ("APA"). Plaintiffs assert that Defendants failed to adequately analyze and disclose the cumulative effects associated with the Project, failed to take a hard look at the effects of the Project, and that the Project violates the Gallatin Forest Plan ("Forest Plan").

**Legal Standards**

## I.      National Environmental Policy Act

"NEPA is a procedural statute that does not 'mandate particular results but simply provides the necessary process to insure that federal agencies take a hard look at the environmental consequences of their actions.'" *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639-40 (9th Cir. 2004) (internal citations omitted.); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)(NEPA "prohibits uninformed–rather than unwise–agency action.")  NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).  NEPA also requires that relevant information be made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson*, 490 U.S. at 349.

Before undertaking any "major Federal action significantly affecting the quality of the human environment," an agency must prepare a detailed environmental impact statement ("EIS").  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.  In order to decide whether an EIS is necessary, an agency may prepare

an environmental assessment ("EA").  40 C.F.R. § 1508.9.  An EA is a "concise

public document" that must "briefly provide sufficient evidence and analysis for

determining whether to prepare an environmental impact statement."  *Id*.; *see also*

*Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).

"NEPA documents must concentrate on the issues that are truly significant to the

action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b)  If

the EA concludes that the proposed action will not have a significant effect on the

environment, the agency may issue a Finding of No Significant Impact and may

then proceed with the action.  40 C.F.R. § 1508.13.

Courts apply a "rule of reason" in reviewing the adequacy of an EA.

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d

989, 992 (9th Cir. 2004).  This requires the court to make a "pragmatic judgment"

as to whether an EA adequately discusses the environmental consequences of a

project and fosters informed public participation.  *California v. Block*, 690 F.2d

753 (9th Cir. 1982).  While courts must "strictly interpret the procedural

requirements in NEPA and the CEQ regulations," *Churchill County v. Norton*, 276

F.3d 1060, 1071 (9th Cir. 2001), courts must "be mindful to defer to agency

expertise, particularly with respect to scientific matters within the purview of the

agency," *Klamath-Siskiyou Wildlands Center*, 387 F.3d at 993 (internal citations

omitted.) "[T]he ultimate standard of review is a narrow one," and a court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## II.     National Forest Management Act

NFMA requires forest planning of National Forests at two levels: the forest level and the individual project level. 16 U.S.C. §§ 1600-1687. At the Forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." 16 U.S.C. § 1604(a). A Forest Plan sets broad guidelines for forest management and serves as a programmatic statement of intent to guide future site-specific decisions within a forest unit. *Citizens for Better Forestry v. U.S. Dept of Agriculture*, 341 F.3d 961, 966 (9th Cir. 2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998). Forest Plans must "provide for multiple use and sustained yield of the products and services" derived from the National Forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).

At the individual project level, NFMA requires that each individual project be consistent with the governing Forest Plan. *Great Old Broads for Wilderness v. Kimbrell*, 709 F.3d 836, 851 (9th Cir. 2013).

The Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference. *Siskiyou Regional Educ. Project v. USFS*, 565 F.3d 545 (9th Cir. 2009); *Forest Guardians v. USFS*, 329 F.3d 1089, 1099 (9th Cir. 2003).

### III.    The Administrative Procedure Act

Under the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedures required by law."  5 U.S.C. § 706(2).  As recently articulated by the Ninth Circuit:

> Under this standard of review, an "agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law. *Id.*

*Organized Village of Kake v. U.S. Dept of Agriculture*, 746 F.3d 970, 974 (9th Cir. 2014).  Though a review of agency action under the APA must be "thorough, probing, [and] in-depth," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415 (1971), the standard of review is "highly deferential," *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service*, 475 F.3d 1136, 1140 (9th Cir. 2007). The court must presume the agency action is valid and affirm it if a reasonable basis exists for the decision. *Id.*

## IV.     Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure a party is entitled to summary judgment if it can show that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Generally, cases involving review of final agency action under the APA do not involve fact finding but only a review of the administrative record. *Northwest Motorcycles Ass'n v. U.S. Dept of Agriculture*, 18 F.3d 1468, 1472 (9th Cir. 1994). Accordingly, summary judgment is the appropriate process to resolve this case.

## Discussion

## I.     NEPA claims

Plaintiffs claim that Defendants violated NEPA in two respects: by failing to adequately analyze and disclose the cumulative effects associated with the Project and by failing to take a hard look at the effects of the Project.

### A.     Cumulative Effects Analysis

Plaintiffs assert that the cumulative effects analysis disclosed in the EA for

the Project is inadequate.  Plaintiffs specifically complain that more information

should have been provided about past timber projects in the Project area, and that

the lack of information about timber projects led to an inadequate cumulative

effects analysis with respect to Canada lynx and pine marten.

In assessing the significance of a particular agency action, NEPA requires

that agencies consider the cumulative impacts of a project.  40 C.F.R. §

1508.27(7).  NEPA defines a cumulative impact as:

> the impact on the environment which results from the incremental
> impact of the action when added to other past, present, and
> reasonably foreseeable future actions regardless of what agency
> (Federal or non-Federal) or person undertakes such other actions.
> Cumulative impacts can result from individually minor but
> collectively significant actions taking place over a period of time.

"Consideration of cumulative impacts requires some quantified or detailed

information that results in a useful analysis, even when the agency is preparing an

EA and not an EIS."  *Center for Environmental Law and Policy v. U.S. Bureau of

Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011)(internal quotation and citation

omitted).  While an agency "may characterize the cumulative effects of past

actions in the aggregate without enumerating every past project that has affected

an area," "[g]eneral statements about 'possible effects' and 'some risk' do not

constitute a hard look absent a justification regarding why more definitive

information could not be provided." *Id.* "Superficial analysis" and "vague generalities" are insufficient to satisfy the Forest Service's obligation to assess cumulative impacts under NEPA. *Id.* at 1008. Without some specific information and analysis of cumulative effects, "neither the courts nor the public, in reviewing [the agency's] decisions, can be assured that the agency provided the hard look" required by NEPA. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

The Ninth Circuit, *see League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Service*, 549 F.3d 1211, 1217 (9th Cir. 2008), and the parties in this case, in looking for guidance on cumulative effects analysis, have referred to and relied on a June 24, 2005 memorandum issued by the Chairman of the Council on Environmental Quality (CEQ), entitled "Guidance on Consideration of Past Actions in Cumulative Effects Analysis" (CEQ Memo). The CEQ is charged with interpreting NEPA. The CEQ Memo presents the agency's interpretation of its own regulations with regard to cumulative effects analysis. It is not plainly erroneous or inconsistent with the language of the regulations, and is therefore entitled to *Auer* deference. *Id.* at 1218 (citing *Auer v. Robbins*, 519 U.S. 452 (1997)). The Court therefore turns to this document for analysis of the instant claims.

The CEQ Memo interprets NEPA's cumulative effects regulations as requiring "analysis and a concise description of the identifiable present effects of past actions to the extent that they are relevant and useful in analyzing whether the reasonably foreseeable effects of the [proposed action] and its alternatives may have a continuing, additive and significant relationship to those effects." (Doc. 20-1 at 1.)  It directs agencies to use scoping "to focus on the extent to which information is relevant," and declares that "agencies have discretion to determine whether, and to what extent, information about the specific nature, design, or present effects of a past action is useful for the agency's analysis." *Id.*

The CEQ Memo explains that "[a]gencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined." *Id.* at 2.  The CEQ Memo directs agencies to focus only on those issues that are significant to the environmental analysis, and advises agencies to reduce the "accumulation of extraneous background data" in favor of "emphasizing real environmental issues and alternatives" associated with past actions.  *Id.* (quoting 40 C.F.R. 1500.2(b).)  The CEQ Memo also endorses narrowing the scope of a cumulative effects analysis based on "practical considerations." *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).  The CEQ Memo also asserts that "[a]gencies retain

substantial discretion as to the extent of such inquiry and the appropriate level of explanation." *Id.* (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376-377 (1989)). Finally, the CEQ Memo states that the "scope of the cumulative impacts analysis is related to the magnitude of the environmental impacts of the proposed action" and that "[p]roposed actions of limited scope typically do not require as comprehensive an assessment of cumulative impacts as proposed actions that have significant impacts over a large area." *Id.* at 3.

Plaintiffs' chief complaint about the cumulative effects analysis performed by the Forest Service for the Project is with respect to the detail provided regarding past timber projects. Plaintiffs contend that more detail about the nature, size, and location of past timber projects needed to be included in the EA to comport with NEPA. Plaintiffs specifically contend that more information about the location and nature of past timber projects is needed to adequately inform the public about the Project's effects on lynx and pine marten. The Court disagrees with Plaintiffs' contentions.

The Project involves approximately 250-acres of commercial thinning in eighteen treatment units of various sizes dispersed across the 1,847-acre project area. The EA provides a general discussion of cumulative effects, including cumulative effects from past forest management activities and private land

harvests, in Chapter Two.  FS-473-477.  In Chapter Three, the EA separately

addresses direct, indirect, and cumulative effects, including cumulative effects

from past timber projects and private land harvests, for each resource managed in

the National Forest.  This includes a separate discussion of cumulative effects with

respect to (1) Forest Vegetation; (2) Fire– Fuels; (3) Economics; (4) Hydrology;

(5) Aquatic Species; (6) Soils; (7) Range; (8) Weeds; (9) Sensitive Plants; (10)

Recreation; (11) Roadless; (12) Scenery; (13) Heritage Resources; (14) Wildlife,

including separate discussions of grizzly bear, Canada lynx, wolverine, bald

eagles, elk and big game, northern goshawk, and American marten; and (15)

Migratory Bird Species.  The direct, indirect, and cumulative effects associated

with each resource are then analyzed within the confines of a resource-specific

"analysis area."[1]  For each resource, the EA contains a section entitled "Affected

Environment," in which the existing condition of the analysis area relative to the

resource at issue is described.  In the Affected Environment section, the effects of

past actions and natural processes are aggregated to produce a resource-specific

description of the affected environment.  The cumulative effects analysis for each

---

[1]  The size of each "analysis area" varies and is tailored to the Project's possible effects
on the resource.  For instance, the analysis area utilized for analysis of effects on Canada lynx is
roughly 150,846 acres while the analysis area with respect to Vegetation is approximately 7,750
acres.

resource then references and incorporates the affected environment section in analyzing cumulative effects. Thus, consistent with the methodology approved in *Center for Environmental Law and Policy*, 665 F.3d at 1007, and the CEQ Memo, the Forest Service here used an aggregated assessment of past actions when performing its cumulative effects analysis.

Plaintiffs' criticism of the EA's discussion of cumulative effects focuses on past timber harvest projects discussed in the section addressing Forest Vegetation. Plaintiffs contend that a table contained within the affected environment section of the chapter on Forest Vegetation, Table 3.8 at FS-503, constitutes "the sum total of the disclosure of past actions for the Project." (Doc. 17 at 19.)

This assertion is off the mark as it ignores the EA's discussion of relevant past actions, including timber projects, that appears in each of the fifteen resource-specific subchapters – all of which contain a description and discussion of past timber projects. Each resource-specific sub-chapter provides information about past forest management activities and timber harvests and how these actions have affected the environment relative to the resource at issue.

Undoubtedly, the EA's discussion of past timber projects could have been more specific, but NEPA does not require more specificity than was provided. A complete review of each resource-specific discussion of cumulative effects, and

specifically the discussion of past timber harvests, demonstrates that the Forest Service took a hard look at this small project's effects on the environment and the relationship between this Project and past actions, including past timber harvests. Indeed, even focusing exclusively on Table 3.8 demonstrates that the Forest Service properly exercised its "substantial discretion" in limiting the extent of the discussion of past timber harvests. (CEQ Memo, Doc. 20-1 at 2.) Table 3.8 reveals, among other things, that in the entire 7,750-acre analysis area established for analysis of Forest Vegetation there have been no timber harvests in the past fifteen years. The Table further reveals that within the analysis area there was a total of 685 acres of timber harvest (292 acres of regeneration harvest and 393 acres of intermediate harvest) in the 1990s, 634 acres of timber harvest in the 1980s, and a grand total of 4 acres of timber harvest in the 1970s. The EA also clarifies that "by design, this project, does not include previously harvested sites within treatment units." FS-581. Additionally, the Administrative Record provides a map disclosing the location of past management activities and their proximity to the treatment units for the Project. FS-1540.

Plaintiffs make no compelling argument why these fairly dated and relatively small past timber harvests needed to be further detailed in order for the Forest Service to adequately assess these past timber harvests' relationship to the

Project, or otherwise comply with NEPA. The EA establishes that "defoliators and bark beetles have been the most significant recent disturbance agent within the analysis area," FS-500, and "[f]ire, insects, and disease have been the most influential historic disturbances within the analysis area," FS-492. Thus, that the EA provides a somewhat truncated and arguably generalized description of past timber harvest projects was not arbitrary or capricious. Rather, it was consistent with the directive of the CEQ Memo that an EA should reduce "the accumulation of extraneous background data," focus on "emphasizing real environmental issues" associated with past impacts in a cumulative effects analysis, and tailor the "scope of the cumulative impact analysis" in relation to the "magnitude of the environmental impacts of the proposed action." (CEQ Memo, Doc. 20-1 at 2, 3.) Further detail about these past projects was not necessary to comply with NEPA.

Likewise, no more detail about past timber projects was required for adequate cumulative effects analysis for lynx or pine marten. The Forest Service utilized the 150,846-acre Bridger/Bangtail Lynx Analysis Unit (LAU) to analyze the Project's effects on lynx. The Affected Environment section for lynx identifies the Bridger/Bangtail LAU as "secondary habitat" for lynx, defined as areas "that may have historical records of lynx, but no documentation of lynx reproductions." FS-634. Despite numerous surveys, no lynx detections have resulted in the

Bridger/Bangtail LAU, and the Forest Service has concluded that the LAU "does not likely have sufficient lynx habitat to support resident lynx, or provide habitat suitable for successful rearing of lynx kittens." FS-635. Nonetheless, the Forest Service has concluded that the LAU "does provide a potential travel corridor for lynx to move through when dispersing between core areas." *Id.* Ultimately, however, lynx habitat in this LAU is "patchily distributed with only 26% (39,628 out of 150, 846 acres) meeting the criteria for boreal forest conditions." *Id.* The remainder of the LAU "is made up of warmer, drier, montane forest types, no-forest vegetation and rocky areas devoid of vegetation." *Id.* Thus, "[g]iven the naturally fragmented distribution of boreal forest types within the Bridger/Bangtail LAU," it is no surprise that with respect to past timber harvests the EA concludes that "past events (natural or man caused) have not likely changed the overall nature of this area for lynx use." FS-639. Under these circumstances, more detail about past timber projects would only constitute extraneous accumulation of background data and the Forest Service properly limited its discussion of past timber projects to the level of detail provided.

The cumulative effects analysis with respect to pine marten also withstands scrutiny. As described in the affected environment section for pine marten, only 1% of the 7,750-acre analysis area utilized for pine marten contains the spruce/fir

dominated stands preferred by marten. FS-670. Moreover, pine marten occur at "much lower densities" in the Bridger Range (where the Project is located) than elsewhere on the Gallatin Forest. FS-669. The cumulative effects analysis for pine marten specifically references the Forest Vegetation section of the EA. FS-672. While the EA acknowledges that "commercial timber harvest is associated with declines in marten occupancy," FS-671, and that past timber management projects, among other influences, have resulted in lower canopy cover in the analysis area, the Forest Service logically concluded that continued decline in canopy cover will occur regardless of Project implementation due to ongoing insect infestation, and that "in the long run, [the Project] would maintain habitat suitability for [pine marten] to a greater degree than would the no action alternative." FS-672. The Forest Service adequately detailed past timber projects for purposes of its cumulative effects analysis with respect to pine marten.

Defendants are entitled to summary judgment on this claim.

**B.      Pine Marten**

Plaintiffs assert that the EA fails to take a hard look at the Project's effects on pine marten. Plaintiffs are concerned that the Project will remove too much coarse woody debris from the Project Area to the detriment of the pine marten. Plaintiffs assert that the EA erroneously relies on an inapposite study, the

Thompson study, to justify the Project and its impacts on pine marten.

Outside of the criticism of the EA's reliance on the Thompson study, Plaintiffs do not actually criticize the sufficiency of the Forest Service's analysis with respect to pine marten. Rather, Plaintiffs merely voice disagreement with the Forest Service's ultimate determination regarding the Project's effects on pine marten. In this regard, Plaintiffs' claim fails because NEPA "does not mandate particular results," but simply ensures that the Forest Service comply with certain procedures. *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639-40 (9th Cir. 2004) (internal citations omitted.) In any event, while dead and down trees do provide coarse woody debris, the Forest Service determined that "dead and dying trees are not a limiting habitat component" in the Project Area. FS-674. The EA contains a sufficiently thorough discussion of the Project's effects on pine marten.

This leaves only the issue of the Forest Service's reliance on the Thompson study. In assessing the no action alternative, the EA concludes that no action would continue to contribute to heavy fuel buildup and the risk of stand-replacing fire, which would be detrimental to pine marten habitat because stand-initiation stage forest are generally unsuitable for pine marten for 40+ years. FS-672. For the proposition that stand-initiation forest are unsuitable for pine marten for a long time, the EA cites to the Thompson study.

Plaintiffs contend that the Thompson study is concerned only with forest regeneration after clearcut logging, rather than wildfire. However, while the Thompson study is specifically focused on forest regeneration after clearcut logging, it is more generally concerned with pine marten success in "regenerating habitats." FS-12860. The Thompson study also specifically concludes that pine marten density declines are similar when habitat is lost through "wildfire *or* forest management." FS-12862 (emphasis added). The EA similarly notes that "[a]cross North America, studies show wildfire and timber harvest have similar effects." FS-671. Accordingly, the Forest Service appropriately relied on the Thompson study for the conclusion that a stand-initiation stage forest in the Project Area, resulting from wildfire, would create unsuitable habitat for pine marten for many years. Defendants are entitled to summary judgment on this claim.

## II.     NFMA claims

Plaintiffs contend that the Project is inconsistent with the Forest Plan's direction that the Forest Service "[m]aintain at least two thirds of the hiding cover associated with key habitat components over time," FS-1684, and manage big game winter range "to meet the forage and cover needs for deer, elk, moose, and other big game species in coordination with other uses." FS-1683. Plaintiffs also contend that because the Project is inconsistent with the Forest Plan, the Forest

Service was required to issue a forest plan amendment.

## A.    Hiding Cover

Plaintiffs contend that by implementing the Project the Forest Service failed to maintain at least two thirds hiding cover associated with key habitat components over time.  Hiding cover is defined as "vegetation capable of concealing 90% of a standing adult big game animal from view of a human at a distance equal to or less than 200 feet."  FS-1849.  Plaintiffs criticize the Forest Service for utilizing a big game hiding cover assessment model which equates hiding cover with coniferous stands with a 40% or greater level of canopy cover.  Plaintiffs contend that this method for measuring hiding cover is inaccurate and not supported by science.  Plaintiffs point to a study performed in the Lewis and Clark National Forest which yielded, apparently, different determinations about the amount of hiding cover associated with stands having 40% or more canopy cover.  It is clear, however, that the big game hiding cover assessment model utilized by the Forest Service for the Project is supported by numerous scientific studies.

The hiding cover assessment model utilized by the Forest Service for the Project, and to establish compliance with the Forest Plan, is based on several Forest Service field studies conducted in the Gallatin National Forest and three

other National Forests in Montana. These studies conclude that "spring/summer/fall hiding cover is provided by tree species or species mixes (occurring on these four national forests) that are naturally capable of having relatively dense (>=40%) canopy cover." FS-13093. Field studies within the Project Area confirm this model for mapping hiding cover. FS-660. Forest Service mapping based on these studies of the Elk Analysis Unit in which the Project lies reveals that 72% of the forested areas capable of providing hiding cover will continue to do so after implementation of the Project.

In arriving at this figure, and the determination that the Project complies with the Forest Plan standard, the Forest Service reasonably relied on the numerous scientific studies performed by Forest Service biologists. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010). Plaintiffs' criticism that a study conducted in a different national forest conflicts with the one relied on by the Forest Service for this Project is insufficient to overcome the deference owed to the agency in making scientific determinations and also fails to demonstrate that the Forest Service made a clear error in judgment in concluding that the Project complies with the Forest Plan. *Id*; *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 384 F.3d 1163, 1174 (9th Cir.2004). Moreover, Plaintiffs ignore the Forest Service's determination that implementing the Project, as opposed to the no

action alternative, will help maintain higher levels of hiding cover in the Project Area over time, as no action would likely result in greater tree mortality from continued insect infestation. Plaintiffs' claim accordingly fails.

**B.     Big game winter range**

Plaintiffs contend that the Project is inconsistent with the Forest Plan's requirement that "big game winter range will be managed to meet the forage and cover needs [of] deer, elk, moose, and other big game species." FS-1683. Plaintiffs contend that because the Project will result in short term reductions in canopy and thermal cover, the Project is inconsistent with the Forest Plan, despite the fact that the Forest Service has determined that implementing the Project is the best way to "maintain some degree of mature trees in the canopy, as opposed to potentially losing the entire canopy to mortality from insects." FS-674-675. Plaintiffs apparently believe that the Forest Plan prohibits the Forest Service from implementing projects that trade some short term pain for long term gain. Such an argument is clearly without merit. The Forest Plan is a prospective document that sets broad guidelines for forest management. Indeed, the standard at issue is prospective in nature, and provides for management direction over time. The Forest Service's decision to achieve compliance with the Forest Plan standard for big game cover by acting to curb epidemic insect infestation (and resulting loss of

cover for big game) is entirely consistent with the Forest Plan. Just as the Forest Service concluded, the Project properly implements the Plan by managing the Forest to meet the cover needs of big game by seeking to avoid further catastrophic levels of tree mortality from insects. Plaintiffs' contrary interpretation of the Forest Plan is irrational, and ignores the substantial deference owed to the Forest Service in its interpretation of its own forest plans. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1057 (9th Cir. 2012). Defendants are entitled to summary judgment on this claim.

Because the Project is consistent with the Forest Plan, Plaintiffs' follow-on claim that the Forest Service needed to amend the Forest Plan also fails.

IT IS ORDERED that:

1)      Defendants' motion for summary judgment (Doc. 23) is GRANTED.

2)      Plaintiffs' motion for summary judgment (Doc. 16) is DENIED.

The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiffs. This case is CLOSED.

Dated this 30th day of July, 2015.

Dana L. Christensen, Chief District Judge
United States District Court